UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY Q. ROWE,

        Plaintiff,

vs.

CORRECTIONAL MEDICAL
SERVICES, INC., *et al.*,

        Defendants.
                                  /

Case No. 1:08-cv-827

Hon. Robert J. Jonker

**REPORT AND RECOMMENDATION**

       This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. This matter is before the court on a motion for summary judgment filed by defendants Haresh Pandya, M.D., Ms. Julie Van Setters, and George Pramstaller, D.O. (docket no. 55).

    **I.**    **Introduction**

       Plaintiff filed this action against five defendants: Dr. Joseph Savage, a Regional Medical Officer at the Michigan Department of Corrections (MDOC); Julie Van Setters, the MDOC's Director of Nursing for Region II; Dr. George Pramstaller, a former Chief Medical Officer for the MDOC; Dr. Haresh Pandya, a Regional Medical Officer for the MDOC[1]; and Dr. William Neslon, a physician at the MDOC's Ionia Maximum Correctional Facility. Neither Dr. Savage nor Dr. Nelson have been served with a summons and complaint in this matter.

       Plaintiff sets forth the following allegations. Plaintiff is a transsexual. Amended Compl. at ¶ 14. Prior to his incarceration in 2007, he received treatment from a private physician,

---

[1] Plaintiff's amended complaint identifies Dr. Haresh Pandya as "Steive Pandya." *See* docket no. 46. This error was noted on Dr. Pandya's acknowledgment of service. *See* docket no. 48.

Alla Sakharova, M.D., for transsexual and gender identity disorders.[2] *Id.* The private physician prescribed plaintiff the following medications: Premetrium 200 mg daily; Aldactone 100 mg daily; and Estradial 2 mg twice daily. *Id.* During plaintiff's initial MDOC evaluation on August 3, 2007, the examining physician, V.S. Thyagargian, M.D., ordered three medications for plaintiff, identified as a transsexual male: Premarin 1.25 mg daily; Estradiol 2 mg daily;[3] and Prometrium 200 mg daily. *Id.* at ¶ 16. The order for these three medications was apparently deferred pending approval by the Regional Medical Officer, Dr. Joseph Savage. *Id.* at ¶ 18. On August 6, 2007, Dr. Thyagargian entered a progress note indicating that Dr. Savage denied administration of the three medications. *Id.* at ¶ 21. A fourth medication, Aldactone, was ordered and administered to plaintiff. *Id.* at ¶ 20.

Plaintiff alleged that Dr. Pramstaller, Dr. Savage and the MDOC denied hormone treatment for his transexualism for reasons other than "sound medical decisions to treat transsexualism based upon an individual assessment of the plaintiff patient's need." *Id.* at ¶ 27. Rather, plaintiff alleged that their decision to discontinue hormone treatment or not to treat plaintiff with hormones for breast development and to inhibit androgen secretion "was based upon administrative and cost considerations" pursuant to a written or unwritten policy or practice of the State of Michigan and/or the MDOC "to save the State and/or Department of Corrections money." *Id.*

Plaintiff filed a grievance on January 6, 2008, relying on the federal court case of *Phillips v. MDOC*, 731 F. Supp. 792 (W.D. Mich. 1990), claiming that deprivation of treatment for transsexualism presents a serious medical need for purposes of deliberate indifference under the

---

[2] The term "gender identity disorder" is sometimes abbreviated as "GID."

[3] Plaintiff refers to Estradiol as "Estrdiol."

Eighth Amendment as set forth in *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). *Id.* at ¶ 36. Among other things, plaintiff's grievance sought "immediate provision of hormones." *Id.* The MDOC did not provide a Step I response to the grievance, and Ms. Van Setters provided a "false statement" in rejecting the Step II appeal as untimely filed. *Id.* at ¶¶ 37-47.

In July 2008, defendant Dr. William Nelson discontinued plaintiff's Aldactone (a testosterone blocker). *Id.* at ¶ 31. Due to the discontinuation of the Aldactone, plaintiff suffered irreversible hardening of silicone, which is apparently located in various parts of his body. *Id.* at ¶¶ 14 and 32.[4] In addition, Dr. Pandya hrefused to issue plaintiff a bra, even though Dr. Nelson ordered one as a special accommodation. *Id.* at ¶ 34.

Plaintiff sets forth the following causes of action against "any one or all" of defendants Dr. Savage, Dr. Pramstaller, Dr. Nelson, Dr. Pandya and Ms. Van Setters. *Id.* at ¶ 55. First, a violation of the Eighth Amendment by denying plaintiff treatment for a serious medical need. *Id.* Second, violating plaintiff's right to equal protection under the law as secured under the Fourteenth Amendment "by refusing to treat plaintiff with hormones while treating other similarly situated prisoners with serious medical needs, plaintiff being a *class of one*, and/or a class of prisoners diagnosed as GID/transsexuals." *Id.* (emphasis in original). Third, that Ms. Van Setters violated plaintiff's "right to petition the government for redress of grievances and/or right to access the court" under the First and Fourteenth Amendments by "interfering with plaintiff's ability to exhaust administrative remedies through the MDOC grievance procedure," "attempting to conceal

---

[4] Plaintiff alleged that he has "loose silicone" in the hip, cheek and breasts, and that his physical characteristics are maintained by the silicone rather than implants. *Id.* at ¶¶ 14, 32.

the underlying constitutional violation," "making false statements regarding time limits," and "otherwise impeding plaintiff['s] access to the court." *Id.*

Plaintiff seeks injunctive, declaratory and monetary relief. Plaintiff seeks an injunction requiring defendants: to provide him with an outside evaluation "by a physician experienced with treating transsexualism;" to provide him with the three medications prescribed by Dr. Thyagargian; and to allow him "to possess and wear a bra as required." *Id.* at ¶¶ 58 and 61. Plaintiff also seeks a declaratory judgment that defendants violated his constitutional rights. *Id.* at ¶ 59. Finally, plaintiff seeks an award of punitive damages against defendants in the amount of $100,000.00 to punish them for their misconduct. *Id.* at ¶ 60.

## II. Legal Standard

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

Defendants Pandya, Van Setters and Pramstaller have moved for summary judgment on plaintiff's amended complaint. Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

4

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the standard for deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III. Discussion

#### A. Plaintiff's claims against Ms. Van Setters

Plaintiff alleged that Ms. Van Setters' improper denial of a Step II appeal of a grievance resulted in violations of his First, Eighth and Fourteenth Amendment rights. The court disagrees. A prison official whose only role involved the denial of an administrative grievance cannot be liable under § 1983. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir.1999). "The mere denial of a prisoner's grievance states no claim of constitutional dimension." *Alder v. Correctional Medical Services*, 73 Fed. Appx. 839, 841 (6th Cir. 2003). *See Martin v. Harvey*, 14 Fed. Appx. 307, 309 (6th Cir. 2001) (observing that the denial of an appeal of a grievance complaining of

inadequate medical care is not the same as the actual denial of a request to receive medical care). Plaintiff has failed to state a federal constitutional claim against Ms. Van Setters. Ms. Van Setters motion for summary judgment should be granted.

### B. Plaintiff's Eighth Amendment claim

### 1. Legal standard

Plaintiff claims that Drs. Pandya and Pramstaller denied him medical care because they failed to provide him with hormones and a brassiere for his transsexual and gender identity disorder. It is well established that an inmate has a cause of action under § 1983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (1976). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Hudson*, 503 U.S. at 8-9. With respect to the infliction of serious pain, courts recognize that "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* at 8 (internal citations and quotation marks omitted). Similarly, "[b]ecause society does not expect

6

that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

### 2. The MDOC's policy directive on Gender Identity

When Dr. Thyagargian examined plaintiff in 2007, the MDOC's policy regarding transsexual prisoners was set forth in Policy Directive 04.06.184 (Eff. April 19, 1993) "Gender Identity Disorders in Prisoners." The MDOC summarized its policy as follows:

> A.   A person with a gender identity disorder is unhappy with his/her biological sex, and desires to be considered a member of the opposite sex. In the extreme gender identity disorder called transsexualism, the individual also has a long-standing desire to replace his or her own physical sexual characteristics (genitals, breasts, voice quality, hair distribution, body shape, etc.) with those of the opposite sex. Gender identity disorders including transsexualism differ from homosexuality, which is sexual attraction to persons of the same sex, and transvestism, which is the wearing of clothing of the opposite sex for sexual gratification.
>
> B.    While imprisonment provides special difficulties in the diagnosis and management of persons with gender identity disorders and transsexualism, these conditions represent serious medical needs which may not be ignored. The best foundation for appropriate management and for avoiding inappropriate interventions is a prompt and thorough initial medical and mental health evaluation, followed by implementation of an individual management plan by both custody and health care staff.

Policy Directive 04.06.184 ¶¶ A and B.

In this case, plaintiff disputes the decision to defer medication, specifically hormones. The Policy Directive addresses the issue of "Hormonal Sex Reassignment Treatment" in some detail. *See* Policy Directive 04.06.184 ¶¶ K and L. The Policy Directive states that Hormonal treatment of a prisoner with a GID may be undertaken only if one or more of the following apply:

1. The prisoner was, immediately prior to incarceration, scheduled for sex reassignment surgery at a recognized university affiliated gender identity disorder clinic (as documented by receipt of definitive records) and was receiving hormonal treatment under that clinic's supervision;

2. the prisoner has been surgically castrated (confirmed anatomically, or in biological females, by receipt of definitive records);

3. the prisoner (typically a biological male) has had years of hormonal treatment, and there is laboratory verification, after two or more months of hormonal treatment, of testosterone or estrogen deficiency with elevated FSH and LH;

4. other circumstances if approved by the Chief Medical Officer, BHCS [i.e., Bureau of Health Care Services].

*Id.* at ¶ K.

The Policy Directive further provides that in each case:

1. The decision to provide hormonal treatment is to be made by a Department physician;

2. written informed consent is to be obtained after detailed discussion of side effects and dangers;

3. only the medically appropriate dose of hormone (e.g., ethinyl estradiol 0.05 mg/day for biological male transsexuals or methyltestosterone 10-20 mg./d for biological female transsexuals) should be used. There is no accepted role for high dose estrogen or high dose progestin or for cycle or parenteral administration in biological male transsexuals.

*Id.* at ¶ L.

### 3. Claims against Dr. Pramstaller and Dr. Pandya

Dr. Pramstaller served as the MDOC's Chief Medical Officer from February 2002 through March 2008. Pramstaller Aff. at ¶ 1 (docket no. 56-5). In his affidavit, Dr. Pramstaller stated that his only involvement in this matter was to approve plaintiff's individual management plan on September 19, 2007. *Id.* at ¶ 4. The plan was formulated by Regional Medical Director Pandya on September 17, 2007. *Id.* This particular plan did not include medications. *Id.* In his affidavit, Dr. Pramstaller also denied that he is against transsexual treatment due to cost. *Id.* at ¶ 5.

In his affidavit, Dr. Pandya stated that he is employed by the MDOC as a Regional Medical Officer for BHCS, Region II, in Ionia, Michigan. Pandya Aff. at ¶ 1 (docket no. 56-4). Effective August 28, 2007, he became acting Regional Medical Officer for BHCS, Region III, when defendant Dr. Joseph Savage was promoted to Assistant Chief Medical Officer. *Id.* at ¶¶ 1-3. As acting Regional Medical Officer, Dr. Pandya provided clinical oversight for the 12 correctional facilities in the region, including the Charles Egeler Reception and Guidance Center. *Id.* at ¶ 4. His responsibilities included formulating Individual Management Plans for prisoners with GID, rendering decisions concerning off-formulary medication requests after a review of the medical care received and acting as a resource person/consulting physician for the on-site physicians. *Id.* On September 17, 2007, Dr. Pandya formulated an Individual Management Plan for plaintiff, based upon the August 3, 2007 physical examination performed by Dr. Thyagargian and the August 21, 2007 psychological evaluation performed by Diana M. Gartland, Psy. D. *Id.* at ¶ 5. This plan did not include any hormone therapy, because plaintiff was awaiting laboratory testing as advised by former Regional Medical Officer Dr. Savage on August 6, 2007, pursuant to Policy Directive

9

04.06.184. *Id.* When the laboratory testing was completed and plaintiff was re-evaluated, the hormone therapy was approved by Dr. Jeffrey Stieve on October 8, 2008, the then-acting Regional Medical Officer for Region II. Id. at ¶ 6. On October 31, 2008, Dr. Pandya submitted an updated Individual Medical Management Plan, which included hormone therapy, to the Chief Medical Officer, who approved the updated plan in November 5, 2008. *Id.* at ¶ 7. Finally, Dr. Pandya stated that due to the hormone therapy, other medication therapy and weight gain, plaintiff's breasts became larger, so he requested a bra. *Id.* at ¶ 8. "After appropriate exam and confirmation for need for a bra, that too was approved under an updated Individual Management Plan on April 9, 2009." *Id.*

Based on this record, the court concludes that neither Dr. Pramstaller nor Dr. Pandya violated plaintiff's Eighth Amendment rights. A threshhold question for the court is whether transsexualism and GID are serious medical needs for purposes of the Eighth Amendment. This court has held that transsexualism is a serious medical need for purposes of the Eighth Amendment. *Phillips v. Michigan Department of Corrections*, 731 F. Supp. 792, 800 (W.D. Mich. 1990), *affirmed*, 932 F.2d 969 (6th Cir. 1991). "Since transsexualism is a recognized medical disorder, and transsexuals often have a serious medical need for some sort of treatment, a complete refusal by prison officials to provide a transsexual with any treatment at all would state an Eighth Amendment claim for deliberate indifference to medical needs." *Murray v. United States Bureau of Prisons*, No. 95-5204, 1997 WL 34677 at *3 (6th Cir. Jan. 28, 1997). However, where the prisoner is receiving treatment, the dosage levels of which are based on the considered professional judgment of a physician, courts are reluctant to second-guess the physician's judgment. *Id.*

In *Praylor v. Texas Department of Criminal Justice*, 430 F.3d 1208 (5th Cir. 2005), the court concluded that the failure to provide hormones to a transsexual inmate is not, in and of itself, an Eighth Amendment violation. In *Praylor*, the court assumed, without deciding, that transsexualism presented a serious medical need, and held that "on this record, the refusal to provide hormone therapy did not constitute the requisite deliberate indifference." *Praylor*, 430 F.3d at 1209. In reaching this determination, the court observed that while it had not addressed the issue of providing hormone treatment to transsexual inmates:

> Other circuits that have considered the issue have concluded that declining to provide a transsexual with hormone treatment does not amount to acting with deliberate indifference to a serious medical need. *See, e.g., White v. Farrier*, 849 F.2d 322 (8th Cir.1988) (acknowledging that transsexualism is a serious medical condition, but holding that declining to provide hormone therapy did not constitute deliberate indifference to that medical need); *Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir.1987) (holding transsexual prisoner has no constitutional right to "any particular type of treatment, such as estrogen therapy"); *Supre v. Ricketts*, 792 F.2d 958, 963 (10th Cir.1986) (concluding that declining to provide hormone therapy did not constitute deliberate indifference when prison officials offered alternate treatment).

*Id.*

Here, the record reflects that plaintiff was receiving psychological services and medical treatment related to his transsexualism/GID while the hormone therapy request was pending. *See, e.g,* Defendants' Exh. A (excerpts of plaintiff's medical records) at pp. 31-33, 63, 67-69, 73, 80-85, 87, 91-95 (docket nos. 56-3 and 63). In addition, the delay in authorizing hormone therapy treatment was based on the sound exercise of medical judgment, as set forth in the Policy Directive. The record reflects that when Dr. Savaged reviewed Dr. Thyagargian's recommendations in August 2007, he deferred ordering the Premarin, Estradiol and Prometrium, citing the Policy Directive:

11

> Pursuant to MDOC policy 04.06.184 and conversation with Dr. Sahkarovam [plaintiff's private physician] on 08/06/07; patient was not scheduled for surgery for gender re-assignment, patient was not surgically castrated, patient does not have a verified testosterone or estrogen deficiency with elevated FSH and LH. Please consider testosterone, estrogen, FSH and LH tests in 8 weeks. Please submit GID physical exam form and mental health services GID evaluation form.

*See* Defendants' Exh. A at p. 23.

In opposing this motion[5], plaintiff points to a letter to the MDOC from his private physician dated September 19, 2007, which stated: that plaintiff was diagnosed with GID "three years ago"; that plaintiff has been under the physician's care for a transsexual disorder and prescribed hormone therapy for three years; that the physician "feels strongly" that plaintiff needs to continue the medications; and that "[a]brupt discontinuation of this therapy can lead to significant physical and mental complications." Dr. Sakharova letter (Sept. 19, 2007) (docket no. 67-3). Plaintiff also suggests that the MDOC did not address his medical concerns, because it did not request plaintiff's medical records from Dr. Sakharova until May 2008. *See* Request for payment and/or authorization (May 28, 2008) (docket no. 67-2).

Viewing the evidence in the light most favorable to plaintiff, the court concludes that defendants Dr. Pandya and Dr. Pramstaller are entitled to summary judgment on this claim. The record reflects that the MDOC physicians undertook testing and examinations before authorizing the hormone therapy consistent with the requirements of Policy Directive 04.06.184. The record reflects that plaintiff did not receive hormone treatment for approximately fifteen months (i.e., from

---

[5] The court notes that plaintiff filed a "Declaration in opposition to defendants motion for summary judgment [sic]." *See* docket no. 67. The declaration (which is unsigned) was attached to a document entitled "Plaintiff's verified motion in opposition to defendants motion for summary judgment [sic]." *Id.* Plaintiff's "motion" and "declaration" are essentially a response to defendants' motion and docketed as such by the Clerk's Office. Although the response was untimely filed, the court has considered the matters raised therein in resolving defendants' motion.

August 2007 through November 2008). Under the circumstances of this case, and given the unique circumstances of the prison setting and the requirements of the Policy Directive, the actions of the Drs. Pramstaller and Pandya cannot be considered a deliberate indifference. Assuming that plaintiff's transsexual condition is a serious medical need, he has no federal constitutional right to receive hormone therapy. *See Praylor*, 430 F.3d at 1209. Furthermore, where the prisoner is receiving treatment with the dosage levels based on the considered professional judgment of a physician, this court is reluctant to second-guess that judgment. *Murray*, 1997 WL 34677 at *3. In this regard, the record reflects that plaintiff received psychological and medical treatment while he was at the correctional facility. Accordingly, Drs. Pramstaller and Pandya are entitled to summary judgment on plaintiff's Eighth Amendment claim.

### C. Plaintiff's equal protection claim

Plaintiff alleged that defendants' violated his right to equal protection of the law as secured under the Fourteenth Amendment to the United States Constitution "by refusing to treat plaintiff with hormones while treating other similarly situated prisoners with serious medical needs, plaintiff being a *class of one*, and/or a class of prisoners diagnosed as GID/transexuals [sic]." Amend. Compl. at ¶ 55 (emphasis in original).

In order to maintain a Fourteenth Amendment Equal Protection claim, plaintiff must prove that he is a member in a protected class and that a state actor purposefully discriminated against him because of his class membership. *See Herron v. Harrison*, 203 F.3d 410, 417 (6th Cir. 2000). "Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality

of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest." *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).

Prisoners are not considered a suspect class for purposes of equal protection litigation. *Jackson v. Jamrog*, 411 F.3d 615, 619 (6th Cir. 2005). However, the Sixth Circuit has determined that a transsexual is a protected class under the Equal Protection Clause. *See Barnes v. City of Cincinnati*, 401 F.3d 729, 739 (6th Cir. 2005) ("[t]he City's claim that [the plaintiff] did not have standing to bring an equal protection claim based on his status as a transsexual also fails, as [the plaintiff] is a member of a protected class - whether as a man or a woman"), citing *Smith v. City of Salem*, Ohio, 378 F.3d 566, 575 (6th Cir. 2004) ("[s]ex stereotyping based on a person's gender non-conforming behavior is impermissible discrimination, irrespective of the cause of that behavior; a label, such as 'transsexual,' is not fatal to a sex discrimination claim where the victim has suffered discrimination because of his or her gender non-conformity"); *Glenn v. Brumby*, 632 F.Supp.2d 1308, 1315 -1316 (N.D. Ga.. 2009) ( "while 'transsexuals' are not members of a protected class based on sex, those who do not conform to gender stereotypes are members of a protected class based on sex").

Equal protection analysis requires strict scrutiny of a state classification only when that classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class. *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 312 (1976). *See Greene v. Livingston*, No. 2:08-cv-101, 2009 WL 1788419 at *3 (W.D. Mich. June 19, 2009) ( "[u]nder the Equal Protection Clause, a state practice generally will not require strict scrutiny unless it interferes with a fundamental right or discriminates against a suspect class of individuals"). Since the Sixth Circuit recognizes transsexuals as a protected class,

14

defendants actions with respect to plaintiff would be subject to "strict scrutiny" as opposed to "rational basis" test. *See Jamrog*, 411 F.3d at 619 (where challenged legislation involved neither a suspect class nor a fundamental right, the district court properly reviewed the legislation under the "rational-basis standard of review").

While the Sixth Circuit has determined that transsexuals are a suspect class for purposes of the Equal Protection Clause, this requires strict scrutiny only where a state classification or practice interferes with a fundamental right or discriminates against a suspect class. Plaintiff has neither alleged or shown either to be the case here. His status as a transsexual is not being denied, nor is he being discriminated against because of it. Rather, his status is being accommodated and he is receiving the necessary medical procedures. Of course, plaintiff's status as a transsexual does not, and as a practical matter, constitutionalize the daily medical decisions made on his behalf. The Sixth Circuit has never required the trial court to substitute its judgment for that of the medical providers who treat the transsexuals on a day-to-day basis, assuming that medical care os being provided. As a general rule, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976). *See Owens v. Hutchinson*, 79 Fed. Appx. 159, 161 (6th Cir. 2003) ("[a] patient's disagreement with his physicians over the proper medical treatment alleges no more than a medical malpractice claim, which is a tort actionable in state court, but is not cognizable as a federal constitutional claim"). The fact that transsexuals are a protected class does not alter this basic principle. Not only does the court not have the expertise to substitute its judgment, the pace at which medical decisions have to routinely be made does not lend itself to judicial determinations.

15

As Policy Directive 04.06.184 makes clear, the treatment of a transsexual prisoner requires a number of medical decisions (e.g., whether the prisoner was scheduled for sex reassignment surgery, whether the prisoner has been surgically castrated, the extent of a prisoner's hormonal treatment, laboratory verification of the hormonal treatment, whether the prisoner has a testosterone or estrogen deficiency, whether the prisoner understands the side effects and dangers of hormonal treatment, and, of course, the type and dosage of hormones that are appropriate for that particular person). Plaintiff should not confuse the medical process required to maintain a prisoner's identity as a transsexual (from which an Eighth Amendment claim could arise for failing to treat a serious medical need) with the question of his status as a transsexual within the prison system (from which a Fourteenth Amendment Equal Protection claim could arise for sex stereotyping based on gender). Here, plaintiff disagrees with the prescribed course of treatment as a transsexual, a medical condition which, like any other medical condition, will be constantly evolving based upon the unique functioning of his body. This court does not substitute its medical judgment for that of plaintiff's medical providers. *See Westlake*, 537 F.2d at 860 n. 5; *Owens*, 79 Fed. Appx. at 16.

Based upon this record, plaintiff has raised an Eighth Amendment claim alleging failure to treat a serious medical need (see discussion in § III.B., *supra*), as opposed to a Fourteenth Amendment claim alleging an Equal Protection violation based on gender. Accordingly, plaintiff's Equal Protection claim should be dismissed.

    **D.**    **Injunctive relief**

Defendants also seek summary judgment with respect to plaintiff's official capacity claim seeking injunctive relief. Here, plaintiff seeks a permanent injunction: to provide him with an outside evaluation of a physician experienced in treating transexualism; to possess and wear a

bra; and to require defendants to provide him with the three medications prescribed by Dr. Thyagargian August 3, 2007: Premarin 1.25 mg daily; Estradiol 2 mg daily; and Prometrium 200 mg daily. Amend. Compl. at ¶¶ 58 and 61. As previously discussed, plaintiff has no cause of action under the Eighth Amendment to require a specific treatment, such as the requested hormone therapy or a bra.[6] Accordingly, plaintiff's request for injunctive relief should be denied.

## IV.  Conclusion

Accordingly, I respectfully recommend that the motion for summary judgment filed by Dr. Pandya, Dr. Pramstaller and Ms. Van Setters (docket no. 55) be **GRANTED**.


Dated:  August 18, 2010            /s/ Hugh W. Brenneman, Jr.
                                   HUGH W. BRENNEMAN, JR.
                                   United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

---

[6] The court notes that plaintiff's request for a bra is moot, because that was approved on April 9, 2009. Dr. Pandya Aff. at ¶ 18.

17